**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| FARMERS TEXAS COUNTY MUTUAL INSURANCE COMPANY, 21st CENTURY CENTENNIAL INSURANCE CO., FARMERS INSURANCE COMPANY, INC., FIRE INSURANCE EXCHANGE, TEXAS FARMERS INSURANCE COMPANY, FOREMOST COUNTY MUTUAL INSURANCE COMPANY, FOREMOST INSURANCE COMPANY GRAND RAPIDS, MICHIGAN, HOME STATE COUNTY MUTUAL INSURANCE COMPANY, TRUCK INSURANCE EXCHANGE, and MID-CENTURY INSURANCE COMPANY, BRISTOL WEST INSURANCE COMPANY, FOREMOST SIGNATURE INSURANCE COMPANY, FARMERS INSURANCE EXCHANGE, | § § § § § § § § § § § § § § § § § | |
| Plaintiffs, | § | Case No. |
| | § | |
| v. | § | **PLAINTIFFS DEMAND TRIAL BY JURY** |
| | § | |
| 1ST CHOICE ACCIDENT & INJURY, LLC, PHUC VINH "CHARLEY" HUYNH, D.C., PHUC KIEN "ANDY" HUYNH, D.C., PHUC "NANCY" HONG HUYNH, D.C., DANIELLE BUI HUYNH, SUSAN HANH HUYNH, HOUSTON PAIN RELIEF & WELLNESS CLINIC, LLC, SMART CHOICE CHIROPRACTIC, LLC, MAXWELL ADU-LARTEY, M.D., TEXAS REGIONAL CLINIC, LLC, MEDICAL CENTER CHIROPRACTIC, LLC, CELEBRITY SPINE & JOINT, LLC, SCOTT M. HUNG, M.D., PROHEALTH MEDICAL GROUP MANAGEMENT, LLC, DAVID SINGLETON, M.D., REID SINGLETON, M.D., SEE CHIN, M.D., COMPLETE PAIN SOLUTIONS, LLC, MATTHEW DANG, M.D., CHAD PORTER, M.D., ALI MAZLOOM, M.D., ORIGIN SPINE INSTITUTE, LLC, ORIGIN MRI and DIAGNOSTICS, LLC and MILLENNIUM PAIN & SURGICAL INSTITUTE, LLC, | § § § § § § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § | |

## COMPLAINT

COME NOW, Farmers Texas County Mutual Insurance Company, 21st Century Centennial Insurance Co., 21st Century North America Insurance Co., Bristol West Specialty Insurance, Farmers Insurance Company, Inc., Fire Insurance Exchange, Texas Farmers Insurance Company, Foremost County Mutual Insurance Company, Foremost Insurance Company Grand Rapids, Michigan, Home State County Mutual Insurance Company, Truck Insurance Exchange, and Mid-Century Insurance Company ("Farmers") to present this their Complaint against Defendants 1st Choice Accident & Injury, LLC, Phuc Vinh "Charlie" Huynh, D.C., Phuc Kien "Andy" Huynh, D.C., Phuc "Nancy" Hong Huynh, D.C., Danielle Bui Huynh, Susan Hanh Huynh, Houston Pain Relief & Wellness Clinic, LLC, Smart Choice Chiropractic, LLC, Maxwell Adu-Lartey, M.D., Texas Regional Clinic, LLC, Medical Center Chiropractic, LLC, Celebrity Spine & Joint, LLC, Scott M. Hung, M.D., ProHealth Medical Group Management, LLC, David Singleton, M.D., Reid Singleton, M.D., See Chin, M.D., Complete Pain Solutions, LLC, Matthew Dang, M.D., Chad Porter, M.D., Ali Mazloom, M.D., Origin Spine Institute, LLC, Origin MRI and Diagnostics, LLC, and Millennium Pain & Surgical Institute, LLC (collectively, "Defendants"), and, for cause, alleges as follows:

## I.  NATURE OF THE ACTION

**The Scheme**

1.  This action is brought by Farmers based upon hundreds of medical bills and supporting documentation that are fraudulent, which 1st Choice Accident & Injury, and the other Defendants have knowingly submitted, or caused to be submitted, to Farmers depicting fraudulent evaluation reports and billing, including substantial templating, up-coding, overbilling, billing for services not rendered, and unwarranted diagnostic procedures, which pertain to individuals ("patients") who were involved in motor vehicle accidents and asserted claims for damages

against Farmers or individuals who were eligible for insurance benefits under Farmers insurance policies. The fraudulent billing amounts to more than 14 million dollars in damages suffered by Farmers.

2.      The pattern of treatment DOES NOT reflect proper treatment of patients.  Rather, the pattern evinces Defendant' greater forethought to profiting from unnecessary medical procedures, and even billing for procedures that were never performed. This pattern of fraudulent billing completely undermines Defendants' ethical obligations to make the patients better, and reveals no readily discernable purpose, except to enrich Defendants at the expense of Plaintiffs. In fact, an analysis of the purported treatment for patients pushed through the Scheme reflects that NINETY NINE PERCENT (99%) of the treatment recommendations made by the chiropractors DID NOT include ANY Chiropractic Manipulative Therapy.  This means that the chiropractors were more interested in furthering this Scheme than providing actual care which in greater probability, might have made their patients better. Shoehorning the medical procedures in these methods unabashedly ignored the need for a more personalized treatment plan for the patients. Therefore, by cutting all corners and pushing patients through a rather pre-engineered assembly line of treatment, Defendants caused Plaintiffs to incur in excess of 14 million dollars in damages.

3.      The general pattern or treatment is:



**Background**

4.      This case involves a scheme, which is referred to herein as the "First Choice Scheme."  It begins with 1st Choice Accident & Injury, a chiropractic provider owned by Phuc Vinh "Charlie" Huynh, D.C. and Phuc Kien "Andy" Huynh, D.C., with thirteen locations in the Houston, Texas area, which include Medical Center Chiropractic, LLC, Smart Choice Chiropractic, LLC, and Houston Pain Relief and Wellness, LLC. 1st Choice additionally contracts out to Houston Spine & Wellness, ADM Chiropractic, US Advance Chiropractic, Golden Chiropractic, and Chiropractic Center of Friendswood, and many others, each of which purportedly conduct initial examinations at their individual facilities, but author reports under the 1st Choice letterhead.

5.      Phuc Vinh "Charlie" Huynh, D.C. and Phuc Kien "Andy" Huynh, D.C. additionally own all or a part of three pain management companies, including Celebrity Spine & Joint, LLC, Millennium Pain & Surgical Institute, LLC, and Origin Spine Institute, LLC.

6.       Danielle Bui Huynh, wife of Phuc Vinh "Charlie" Huynh, D.C., owns ProHealth Medical Group Management, LLC, through which Scott Hung, M.D. participates in the scheme.

7.      The Scheme is controlled by those most closely connected to the Huyhn brothers:



8.     The bills and supporting documentation the Defendants submitted, or caused to be submitted, to Farmers are fraudulent because patterns in the findings within the patients' initial examination reports are not credible and evidence a medical build-up scheme with significant templating. These patterns evidence overwhelming overlap in patient information pertaining to family history, exercise habits, diet and nutrition, gait, symptoms prior to the accident, orthopedic testing results, neurological findings, and treatment recommendations regardless of age, gender, or injury. Patterns are further identified in identical grammatically incorrect sentencing and missing punctuation, repeated in reports authored by the multiple different providers.

9.     The fraudulent scheme is designed to enrich Defendants by exploiting two common claims scenarios, namely (a) bodily injury claims ("BI Claims"), including personal injury protection ("PIP") claimants, made by individuals not substantially at fault for automobile accidents to the insurance companies of the individuals who are substantially at fault for such accidents ("At-Fault Drivers"), in which they seek to recover economic losses (including past and future medical expenses) and non-economic losses (including pain and suffering); and (b) underinsured/uninsured motorist claims ("UM Claims") made by individuals to their own insurance companies if their recoveries under BI Claims from the At-Fault Drivers' insurance companies are insufficient to compensate the individuals for their economic and non-economic losses as a result of the accident.

10.    Under Texas law, insurers may be subject to substantial liability if they fail to accept "reasonable" settlement demands on BI Claims. Specifically, under the *Stowers* doctrine, if (1) an insurer for an At-Fault Driver fails to accept a reasonable settlement demand at or  within policy limits in a short time frame, often 30 days or less, specified in the written demand from the injured party's personal injury attorney ("PI Attorney"), and (2) the At-Fault Driver incurs a judgment in excess of policy limits at trial, the insurer may be subject to liability for  the excess

judgment. *See G.A. Stowers Furniture Co. v. American Indemnity Co.*, 15 S.W.2d 544 (Tex. 1929).

11.     With respect to a PIP Claim, the claim for medical payment is presented with no question of liability assessment and full, justifiable reliance upon the veracity of the medical records and billing presented by the Claimant.

12.     With respect to UM Claims, Texas law provides that an insurer likewise may be liable to its own insured for bad faith if it "fail[s] to attempt in good faith to effectuate a prompt, fair, and equitable settlement of . . . a claim with respect to which the insurer's liability has become reasonably clear."  TEX. INS. CODE § 541.060(a)(2)(A); see *also* TEX. INS. CODE § 542.003. If found liable for bad faith, an insurer may be responsible for its insured's compensatory damages, attorneys' fees, and potentially treble damages. TEX. INS. CODE § 541.152.

13.     The Defendants' scheme is designed to enrich Defendants by inducing Farmers to (1) rely on their bills and supporting documentation that on their face purport to substantiate the need for medical treatment and (2) settle BI and UM Claims within policy limits, and often for all or most of the limits, to protect Farmers and their insureds from potential judgments exceeding policy limits and/or avoid potential liability for bad-faith claims.

14.     To facilitate their scheme, 1st Choice and the other Defendants: (a) prepare fraudulent examination reports; (b) prepare fraudulent billing and medical reports documenting treatments that are not actually performed; and (c) provide these fraudulent documents and bills to the PI Attorneys representing the patients in BI Claims, PIP Claims, and UM Claims who, in turn, submit the bills and documentation to Farmers to support written demands to settle the claims within 30 days, and often within 14 days.

15.     The Defendants' fraudulent bills and supporting documentation are designed to be and, in fact, have been substantial factors in inducing Farmers to pay the PIP Claims and to settle the BI Claims and UM Claims at issue by causing them to make higher settlement offers than

would be warranted without the fraudulent bills and supporting documentation from the Defendants.

16.     Farmers has sustained damages in excess of $14 million in paying the PIP Claims and in settling the BI and UM Claims at issue. The Defendants' fraudulent documentation and bills have been a substantial factor and, in fact, have caused Farmers to incur damages by agreeing to settle claims that otherwise might not have been settled, or by paying more to settle these claims than they would have had they known the Defendants' bills and supporting documentation were fraudulent. Farmers was the target of the Defendants' scheme, and its damages are directly related to and are a natural consequence of the scheme. As a result, Farmers is entitled to damages in excess of $14 million, or to a lesser amount to be proven at trial, but no less than the amounts that Defendants actually received as a result of the scheme.

17.     Because Defendants' actions entailed, in large part, the perpetual criminal behavior aimed at concealing the pattern of racketeering, Plaintiffs lacked access to all the facts to be put on notice of their claims, to the point that it was impossible to discern and detail. For these reasons, Defendants' pattern of racketeering and fraud remained obscure for several years. The best estimation by Plaintiffs is that Defendants' scheme began at least as early as 2016, and it has continued uninterrupted since that time.

18.     The Defendants' scheme began at least as early as 2016, and it has continued uninterrupted since that time.

19.     Farmers brings this action asserting a statutory claim under 18 U.S.C. § 1962(c) ("RICO"), as well as a common law claim for money had and received, to recover actual damages in excess of $14 million, or to a lesser amount to be proven at trial, but no less than the amounts that Defendants actually received as a result of the scheme, plus treble damages and costs, including reasonable attorneys' fees.

## II.      JURISDICTION AND VENUE

19.      Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the RICO cause of action brought under 18 U.S.C. § 1961 *et seq.* because it arises under the laws of the United States.

20.      Pursuant to 28 U.S.C. § 1367(a), this Court also has supplemental jurisdiction over the money-had-and-received cause of action because it is so related to the RICO cause of action over which the Court has original jurisdiction that they form part of the same case or controversy.

21.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district because Defendants reside here and a substantial part of the events or omissions that gave rise to the causes of action occurred here.

## III.      THE PARTIES

### A.      Plaintiffs

22.      Farmers Texas County Mutual Insurance Company is a citizen of the state of Texas. It is formed under the laws of and domiciled in the State of Texas. Farmers is licensed and engaged in the business of insurance in Texas.

23.      21st Century Centennial Insurance Co. is licensed and engaged in the business of insurance in Texas.

24.      Farmers Insurance Company, Inc. is licensed and engaged in the business of insurance in Texas.

25.      Farmers Texas County Mutual Insurance Company is licensed and engaged in the business of insurance in Texas.

26.      Fire Insurance Exchange is licensed and engaged in the business of insurance in Texas.

27.      Texas Farmers Insurance Company is licensed and engaged in the business of insurance in Texas.

28.     Foremost County Mutual Insurance Company is licensed and engaged in the business of insurance in Texas.

29.     Foremost Insurance Company Grand Rapids, Michigan is licensed and engaged in the business of insurance in Texas.

30.     Home State County Mutual Insurance Company is licensed and engaged in the business of insurance in Texas.

31.     Truck Insurance Exchange is licensed and engaged in the business of insurance in Texas.

32.     Mid-Century Insurance Company is licensed and engaged in the business of insurance in Texas.

33.     Bristol West Specialty Insurance is licensed and engaged in the business of insurance in Texas.

34.     Foremost Signature Insurance Company is licensed and engaged in the business of insurance in Texas.

35.     Farmers Insurance Exchange is licensed and engaged in the business of insurance in Texas.

**B.      Defendants**

36.     Defendant 1st Choice Accident & Injury, LLC was formed on or about September 6, 2012, with its registered office located at 12435 Beechnut Street, Suite 101, Houston, Texas 77072. On information and belief, 1st Choice's governing persons are Phuc Vinh "Charlie" Huynh, D.C., Phuc Kien "Andy" Huynh, D.C.  Accordingly, 1st Choice Accident & Injury, LLC is and has been a citizen of Texas throughout its existence.

37.     Defendant Phuc Vinh "Charlie" Huynh, D.C. resides in and is a citizen of the State

of Texas. Dr. Huynh owns 1st Choice and is linked to numerous other businesses including, Smart Choice Chiropractic, LLC, Medical Center Chiropractic, LLC, Celebrity Spine & Joint, LLC, Millennium Pain & Surgical Institute, LLC, Huynh Investment Group, LLC, Huynh Consortium, LLC, and Signature RX, LLC.

38.     Defendant Phuc Kien "Andy" Huynh, D.C. resides in and is a citizen of the State of Texas. Dr. Huynh owns 1st Choice and is linked to numerous other businesses including, Smart Choice Chiropractic, LLC, Medical Center Chiropractic, LLC, Celebrity Spine & Joint, LLC, Millennium Pain & Surgical Institute, LLC, Origin Spine Institute, LLC, and Signature RX, LLC.

39.     Defendant Danielle Bui Huynh, wife of Phuc Kien "Andy" Huynh, resides in and is a citizen of the State of Texas. Mrs. Huynh owns or controls ProHealth Medical Group Management, LLC.

40.     Defendant Susan Hanh Huynh, wife of Phuc Vinh "Charlie" Huynh, resides in and is a citizen of the State of Texas. Mrs. Huynh owns or controls Principle Consulting, LLC, which owns or controls ZTTL Growth Investments, LLC, which owns 66% of Origin Spine Institute, LLC.

41.     Defendant Phuc "Nancy" Hong Huynh, D.C., sister of Phuc Vinh "Charlie" Huynh, D.C. and Phuc Kien "Andy" Huynh, D.C., resides in and is a citizen of the State of Texas. Upon information and belief, Dr. Huynh owns and/or controls Medical Center Chiropractic, LLC and is actively involved in the preparation of fraudulent records.

42.     Defendant Houston Pain Relief & Wellness Clinic, LLC was formed on or about August 8, 2011, with its registered office located at 12435 Beechnut Street, Suite 101, Houston, Texas 77072. On information and belief, it is owned and controlled by Phuc Vinh "Charlie" Huynh, D.C. and Phuc Kien "Andy" Huynh, D.C. Accordingly, it is and has been a citizen of Texas throughout its existence. Houston Pain Relief & Wellness Clinic, LLC has received a

portion of the funds obtained through the Huynh's fraudulent scheme.

43.     Defendant Smart Choice Chiropractic, LLC was formed on or about January 22, 2014, with its registered office located at 12435 Beechnut Street, Suite 101, Houston, Texas 77072. On information and belief, it is owned and controlled by Phuc Vinh "Charlie" Huynh, D.C. and Phuc Kien "Andy" Huynh, D.C. Accordingly, it is and has been a citizen of Texas throughout its existence. Smart Choice Chiropractic, LLC has received a portion of the funds obtained through the Huynh's fraudulent scheme.

44.     Defendant Maxwell Adu-Larty, M.D. resides in and is a citizen of the State of Texas. Upon information and belief, Dr. Adu-Lartey works at Texas Regional Clinic and is actively involved in the preparation of fraudulent records.

45.     Defendant Texas Regional Clinic, LLC was formed on or about March 14, 2018 with its registered office at that time located at 719 Sawdust Road #204, The Woodlands, Texas 77380.  Accordingly, it is and has been a citizen of Texas throughout its existence. Texas Regional Clinic has received a portion of the funds obtained through the Huynh's fraudulent scheme.

46.     Defendant Medical Center Chiropractic, LLC was formed on or about March 5, 2013, with its registered office located at 2646 South Loop West, Suite 310, Houston, Texas 77054. On information and belief, it is owned and controlled by Phuc "Nancy" Hong Huynh, D.C. Accordingly, it is and has been a citizen of Texas throughout its existence. Medical Center Chiropractic, LLC has received a portion of the funds obtained through the Huynh's fraudulent scheme.

47.     Defendant Celebrity Spine & Joint, LLC was formed on or about January 19, 2016, with its registered office located at 12435 Beechnut Street, Suite 101, Houston, Texas 77072. On information and belief, it is owned and controlled by Phuc Vinh "Charlie" Huynh, D.C. Accordingly, it is and has been a citizen of Texas throughout its existence. Celebrity Spine & Joint,

LLC has received a portion of the funds obtained through the Huynh's fraudulent scheme.

48.     Defendant Scott M. Hung, M.D., resides in and is a citizen of the State of Texas. Upon information and belief, Dr. Hung works at ProHealth Medical Group Management, LLC and is actively involved in the preparation of fraudulent records.

49.     Defendant ProHealth Medical Group Management, LLC was formed on or about January 5, 2015, with its registered office located at 12435 Beechnut Street, Suite 101, Houston, Texas 77072. On information and belief, it is owned and controlled by Danielle Bui Huynh, wife of Phuc Kien "Andy" Huynh, D.C. Accordingly, it is and has been a citizen of Texas throughout its existence. ProHealth Medical Group Management, LLC has received a portion of the funds obtained through the Huynh's fraudulent scheme.

50.     Defendant David Singleton, M.D. resides in and is a citizen of the State of Texas. Upon information and belief, Dr. Singleton works at Celebrity Spine & Joint, LLC and is actively involved in the preparation of fraudulent records.

51.     Defendant Reid Singleton, M.D. resides in and is a citizen of the State of Texas. Upon information and belief, Dr. Singleton works at Celebrity Spine & Joint, LLC and is actively involved in the preparation of fraudulent records.

52.     Defendant See Chin, M.D., resides in and is a citizen of the State of Texas. Upon information and belief, Dr. Chin works at Celebrity Spine & Joint, LLC and Complete Pain Solutions, LLC and is actively involved in the preparation of fraudulent records.

53.     Defendant Complete Pain Solutions, LLC was formed on or about April 15, 2015, with its registered office located at 1445 Ross Ave, Suite 2400, Dallas, Texas 75202. Accordingly, it is and has been a citizen of Texas throughout its existence. Complete Pain Solutions, LLC has received a portion of the funds obtained through the Huynh's fraudulent scheme.

54.     Defendant Matthew Dang, M.D., resides in and is a citizen of the State of Texas. Upon information and belief, Dr. Dang is actively involved in the preparation of fraudulent records.

55.     Defendant Chad Porter, M.D., resides in and is a citizen of the State of Texas. Upon information and belief, Dr. Porter is actively involved in the preparation of fraudulent records.

56.     Defendant Ali Mazloom, M.D. resides in and is a citizen of the State of Texas. Upon information and belief, Dr. Mazloom is actively involved in the preparation of fraudulent records.

57.     Defendant Origin Spine Institute, LLC was formed on or about August 8, 2020, with its registered office located at 83 Silent Manor Dr., Sugarland, Texas 77498. On information and belief, it is owned by Origin Consulting, LLC (33%) and ZTTL Growth Investments, LLC. (66%). Accordingly, it is and has been a citizen of Texas throughout its existence. Origin Spine Institute, LLC has received a portion of the funds obtained through the Huynh's fraudulent scheme.

58.     Defendant Origin MRI and Diagnostics, LLC was formed on or about May 19, 2020, with its registered office located at 83 Silent Manor Dr., Sugarland, Texas 77498. On information and belief, it is owned by Origin Consulting, LLC. Accordingly, it is and has been a citizen of Texas throughout its existence. Origin MRI and Diagnostics, LLC has received a portion of the funds obtained through the Huynh's fraudulent scheme.

59.     Defendant Millennium Pain & Surgical Institute, LLC was formed on or about August 25, 2016, with its registered office located at 12435 Beechnut Street, Suite 101, Houston, Texas 77072. On information and belief, it is owned and controlled by Phuc Vinh "Charlie" Huynh, D.C. Accordingly, it is and has been a citizen of Texas throughout its existence. Millennium Pain & Surgical Institute, LLC has received a portion of the funds obtained through

the Huynh's fraudulent scheme.

## IV.    ALLEGATIONS COMMON TO ALL COUNTS

### A.    The Fraudulent Evaluation Reports and Billing

60.    The Scheme is perpetrated through a series of medical buildup steps that begin with a patient being examined by a licensed chiropractor with 1st Choice or one of its contracted providers. The initial evaluations purport to take the following, but not limited to, patients' symptoms, treatment immediately following the accident, activities of daily living, physical examination and recommendations. There are numerous instances of fraudulent reports that stem from the fraudulent business practices of the Defendants. Upon review of a statistically significant sample of 1st Choice claimants, 497 claimants, Farmers identified unusual patterns and similarities among the patients, regardless of age, gender, weight, past medical history, or current injuries. Some examples of these fraudulent activities include the following.

### i.    Grammatical Errors and Missing Punctuation

61.    The initial narrative reports seen in all of the submitted files were signed and dated by the authoring provider. The reports themselves contained several inconsistencies that were carried over from facility to facility/doctor to doctor. For example, one such inconsistency that was repeated was the grammatically incorrect sentence: **"Not all modality (sic) may be use (sic) dependent (sic) upon patient's medically (sic) necessity on the date of treatment."** This same phrase containing the grammatical errors was found in **142 of the patient charts**. The use of this sentence was first seen in a report dated November 9, 2018 and was last seen in a report created on September 9, 2020. The fact that these grammatical/typographical errors were repeated over long periods of time, by multiple different providers, in multiple locations would suggest 1st Choice utilizes boilerplate/templated reports which are cloud based.

62.     Adding to such a conclusion is the consistent lack of punctuation within reports authored by multiple providers in **EIGHTEEN LOCATIONS**. There were 87 reports authored by 1st Choice providers that **did not contain periods**. This lack of punctuation was found in three distinct parts of the patient charts: the initial examination reports, which carried over to the daily treatment notes, as well into the re-examination reports (**See, Ex. A**).

**Claim 3010219308-1-2**

**Initial Examination Report:**

History of Current Complaint
Mr ▊▊▊ entered the office on 1/29/2018 ▊▊▊ igned consent for evaluation and possible treatment of injuries sustained as the result of a motor vehicle crash that occurred on or about 1/26/2018 Tien thought the symptoms would resolve without treatment, however, the symptoms continued Therefore, he sought treatment since the symptoms did not subside Patient complained at the time of the accident, he felt pain in the following area(s) left shoulder, left wrist, left knee, neck, upper back, mid back and low back Patient also complained of sleep disturbance, headaches, muscle spasms, soreness, numbness/tingling, dizziness and fatigue Tien reported that these complaints are aggravated by almost any cervical, thoracic, lumbar, left shoulder, left wrist, and left knee movements and relieved by nothing ▊▊▊ also denied previous episodes of this condition Since that date the symptoms have been worse ▊▊▊ symptoms were not present prior to the accident, therefore it is my opinion the symptoms were caused by the accident

**Daily Treatment Notes for the same patient:**

- Subjective/Patient Assessment

▊▊▊ stated has been having trouble sitting, walking, and standing for periods of time because of the constant pain in his back He mentioned he has trouble driving since it aggravates the pain when he sits for periods of time

- Objective Finding

Patient was seen constantly fidgeting around during treatment

**Re-examination Report for the same patient:**

Transition patient to active care to strengthen the affected area(s) and increase functions Sets and repetitions are based on patient tolerance and physical condition After initial muscle re-education, patients are taken to the maximum repetitions the muscles can sustain All exercises/therapy may be used in combination or separately Refer patient for left shoulder, neck and low back MRI to rule out disc pathology

Tx Effect No therapy was rendered on today's visit Patient will continue on next visit

Provider Signature

2/28/2018 5 49 40 PM
NPI 1073788824

63.     These reports were authored by Drs. Africa Trent, D.C., Nancy Huynh, D.C., Chad Golden, D.C., Khanh Le, D.C., Brian Le, D.C., Gabor Farkas, D.C., Maxwell Adu-Lartey, M.D., Africa Trent, D.C., Faiqha Ansari, D.C., Adebola Ayeni, D.C., Chad Golden, D.C., Soyoung Yun,

D.C., and Gabor Farkas, D.C.. <u>All of these reports were authored under the 1st Choice letterhead, but from the following locations</u>:

> 10694 Jones Road: Cypress-Smart Choice Chiro
> 11821 East Fwy. #310: ADM Chiropractic
> 12435 Beechnut: Houston Pain Relief & Wellness
> 12846 East Fwy.: Golden Chiropractic
> 14520 Old Katy Road: Houston Pain Relief & Wellness
> 16770 Imperial Valley: Smart Choice / Greenspoint-Smart Chiro
> 17115 Red Oak Dr.: ADM Chiro.
> 201 Kingwood Med Dr.: Smart Choice
> 2030 N. Loop West, #260: Houston Pain Relief & Wellness
> 2626 S. Loop West: Medical Center Chiro
> 2734 Sunrise Blvd.: #101 Smart Choice
> 3344 East FM 528: Chiro Center of Friendswood
> 3744 Broadway St. A-2: Medical Center Chiro
> 440 Codia Dr. #1502: US Advanced Chiro.
> 6065 Hillcroft St., #513: US Advanced Chiro.
> 8136 S. Kirkwood Rd. #C: Houston Pain Relief & Wellness
> 918 W. Southmore Ave. #100: Houston Spine & Wellness
> 9656 Katy Fwy.: Houston Pain Relief & Wellness

64.    Not only were these punctuation errors found in 1st Choice files, but these similarities carried over to reports allegedly authored by Scott Hung, M.D. at ProHealth and various other consulting entities. For example, within Claim **3010091648-1-3** we find the initial report from 1st Choice provider Gabor Farkas, D.C. at 16770 Imperial Valley, Houston, Texas under "Greenspoint-Smart Choice Chiropractic" letterhead (**See, Ex. B**):



A report is authored by Scott Hung, M.D. from ProHealth Medical Group Management three days later that carries the same lack of punctuation:

08/06/2018                                                    Progress Notes:  Scott H. Hung, MD

| | |
|---|---|
| **Current Medications**<br>None | **Reason for Appointment**<br>1  Medical consultation for injuries |
| **Past Medical History**<br>No Medical History | **History of Present Illness**<br>History of Presenting Illness |
| **Surgical History**<br>left femur/hip fx on f s/p MVC | HX.<br>Date of MVC (motor vehicle collision) injuries occurred on or around 1/4/2018<br>She started PT with Dr Derek Martin on 8/3/2018<br>Restrained driver was rear-ended |
| **Family History**<br>Non-Contributory | No airbags deployed  Went to the ER the next day<br>Reports ER CT and X-rays were done |
| **Allergies**<br>N K D A. | C/o pain/stiffness in neck & back. Feels tingling/numbness in legs<br>Neck pain radiates to shoulders  Low back pain radiates to hips |
| **Review of Systems** | Having frequent headaches, trouble sleeping, fatigue, dizziness & anxiety since injuries |

A report is then authored by David Singleton, M.D. some two weeks later at 1900 N.

Loop West, Suite 160, Houston, Texas under "Celebrity Spine & Joint" letterhead:

PATIENT NAME:        ▮▮▮▮▮▮
DATE OF BIRTH:        8/20/1984
DATE OF INJURY       1/4/2018
REFERRING PROVIDER:  Dr Derek Martin
DATE OF VISIT         9/21/2018
LOCATION             1900 N Loop West, Suite 160, Houston, TX, 77018

VITAL SIGNS:
BP  128/79   Heart Rate  64 bpm   HT 5 ft  5 in   WT 184 lbs

CHIEF COMPLAINT·  Cervical, Lumbar and Right Shoulder pain

HISTORY OF PRESENT ILLNESS.  Patient is a 34-year-old left-handed female presenting with neck, low back and right shoulder pain   She was in her usual state of good health until on or around 1/4/2018 when she was a restrained driver involved in a motor vehicle collision   Patient states she went to the emergency room where an exam was performed, x-rays were taken, and she was discharged to her treating physician   Appropriate conservative care has been provided by Dr Derek Martin, to include rest, decreased activities, light duty and physical therapy program (passive and active modalities)  Ms ▮▮ states her neck pain is constant and central that radiates in between both shoulder blades and right shoulder  He right shoulder pain is constant with or without movement  Her low back pain is central and radiates down to both hips with numbness and tingling in both buttocks

65.      In this one chart, three different providers were seen and in each case the reports

that were generated did not contain periods. **The pattern was repeated in 100% of the charts**

**that did not contain periods between 1ˢᵗ Choice providers and reports produced by Scott**

**Hung, M.D.** There was also a very strong correlation between a third provider who was seen as a

consultant specialist. These reports were authored by Drs. Noah Godwin, M.D., Andrew Lee,

M.D., Kevin Jack Anuvat, M.D., David Singleton, M.D., Maxwell Adu-Lartey, D.O., Reid

Singleton, M.D., See Chin, M.D., and Kenneth Berliner, M.D. from Davinci Pain, Complete Pain

Solutions, Spine & Orthopedic Surgical Institute, Celebrity Spine & Joint, and Lone Star

Orthopedics. **This could only be practically done if some type of cloud-based software and**

***pre-populated, templated reports* were being used**.

### ii.    Report Timing

66.    Further supporting Plaintiffs' contention that Defendants' reports are fraudulent is the time in which these reports were created. Each report documented an examination that would take even the most skilled provider 45 minutes to perform. 1st Choice billed each initial examination using the 99203 which has a typical "face-to-face" time of 30 minutes. The following are examples of narrative reports being created in very short time frames. It would be **impossible** to author such reports if they were done contemporaneously at the time the services were rendered.

**Claims 3010119641-1-4, 3010119641-1-3 & 3010119641-1-2 (**See, Ex. C**).**

Soyoung Yun, DC signed these reports a mere 3 and 14 seconds apart from each other:



Provider Signature

1/15/2018 6:14:12 PM
NPI: 1578965331

Provider Signature

1/15/2018 6:14:15 PM
NPI: 1578965331

Provider Signature

1/15/2018 6:14:29 PM
NPI: 1578965331

**Claims 7001084140-1-4 & 7001084140-1-5 (**See, Ex. D**).**

These two reports, authored by Faiqha Ansan, D.C., were created within 7 seconds of one another.



Provider Signature

3/2/2020 5 16 07 PM
NPI  1538723523

Provider Signature

3/2/2020 5 16 14 PM
NPI  1538723523

**Claims 7001244160-1-6, 7001244160-1-5 & 7001244160-1-7 (See, Ex. E).**

Three reports in these claims were authored within 2 minutes and 2 seconds of one another by Khanh Le, D.C.



67.     The findings noted above can only be explained with two scenarios: (1) The doctors are taking notes during the examinations and are authoring the reports at a later time, guided by their notes or (2) the providers are using a cloud-based boilerplate report writing software that had **pre-populated exam findings**. It cannot be the first, because 1st Choice and the other providers have not produced one set of handwritten doctor's notes, which they are legally obligated to preserve and provide. **This suggests that the 1st Choice entities and providers are in fact creating reports with templated, *pre-populated exam findings*.**

### iii.    Exam Findings

68.     As described above, another uniformity identified among the 1st Choice reports are the exam findings. Within the sample of claim files, 309 of the 497 patients, or 62%, presented with cervical spine complaints. 100% of the patients who presented with cervical spine complaints allegedly had complaints in all six planes of in **active** motion (flexion, extension, right & left lateral flexion, right & left rotation). Active motion occurs when the patient is asked to move the joint(s) on their own. In the 1st Choice population of patients, no matter if the patient presented days or months after the auto accident, **not one patient** that presented with neck (cervical) complaints was able to move their neck **in any of the 6 planes of motion** without a subjective complaint of pain. Those same patients also reported pain in all six planes upon **passive** range of motion. Passive motion tests occur when the doctor moves the patient's neck in all six planes; flexion, extension,

right & left lateral flexion, right & left rotation. As to how all the doctors who worked at the various 1st Choice facilities were able to perform "passive" range of **extension** by "… look up at the ceiling: pain level increase" is unknown. Passive range of motions are done by placing the patient in a position whereby the muscles that affect that joint are not being used. In the cervical spine, this would contemplate the doctor placing the patient in a supine position, face up. By doing so, the muscles of the neck would not be recruited and would be in a relaxed state. Once the neck muscles are in a relaxed state, the doctor would then place his/her hands on the neck and put the patient through the various planes of motion. In the case of extension of the cervical spine, as to how the patient in the supine position, **face up,** could have pain when "look up at the ceiling" is unknown. (**See, Ex. F**).

**Claim 3009859591**



69.     The same pattern was found no matter the presenting complaint, with the reported range of motions (both in "active" and "passive"). **<u>Not one patient was able to have a pain free plane of motion, to any body part, in both passive and active motions no matter the area of complaint.</u>** Remarkably, this same pattern continued even if the patient entered with bilateral complaints to an affected extremity. For example, no matter if a patient entered with unilateral or bilateral shoulder complaints, every patient allegedly had pain in all 7 planes of motion (**See, Ex. G**).

**Claim 3009900270**



70.     This was reported in both "active" and "passive" examinations. Not one patient was able to have a single pain free motion, in either active or passive attempts, no matter if the patient presented a few days after an accident, or months later.

**iv.     Gait**

71.     The examining providers reported "gait" in the initial examination reports authored by 1st Choice providers. Remarkably, there are multiple examples of reported "normal" gait in patients who allegedly had **bilateral lower extremity complaints/exam findings**. One patient entered the 1st Choice facility with complaints arising from left **knee**, left **ankle**, neck, upper back, mid back, low back and right shoulder. The doctor recorded positive orthopedic testing of the left knee and ankle, as well as painful range of motion, active and passive, in both the left knee and left ankle and foot. In what appears to be a clinical contradiction, the doctor reported this patient's gait as "**normal** gait and balance."

**Claim 3011902087-1-3 (See, Ex. H):**

Musculoskeletal Exam
  - Gait and Station  normal gait and balance
  - Inspection/Percussion +/or Palpation:  cervical, thoracic, lumbar, right shoulder, left knee, and left ankle.
  - Muscle Strength and Tone:  moderate to severe muscle spasms in the following areas: cervical, thoracic, lumbar, right shoulder, left knee, and left ankle.

72.     Another example is seen in a **two-and-a-half-year-old female** patient who entered the 1st Choice facility 4 days after a motor vehicle accident. At that time, the patient only presented with complaints that arose from **both** her left and right leg. The doctor reported "**normal** gait and balance."

**Claim 7000925567-1-4 (See, Ex. I):**

Musculoskeletal Exam
- Gait and Station   normal gait and balance
- Inspection/Percussion +/or Palpation   right leg and left leg
- Muscle Strength and Tone   mild muscle spasms in the following areas  left leg and right leg

73.     A third patient presented with complaints arising from her left forearm, left **thigh**, left **ankle**, left **foot**, upper back, low back, right **ankle**, and right **foot.** The doctor reported this same patient had pain, in all planes of motion, in **both** active and passive exams to **both ankle and feet** and listed positive orthopedic tests for both ankles. Yet, the doctor indicated the patient's gait as "normal gait and balance."

**Claim 3010999552-1-2 (See, Ex. J):**

Musculoskeletal Exam
- Gait and Station:  **normal gait and balance**
- Inspection/Percussion +/or Palpation:  **thoracic, lumbar, and bilateral feet**
- Muscle Strength and Tone:  **moderate to severe** muscle spasms in the following areas: **thoracic, lumbar, and bilateral feet**

**History of Current Complaint:**
Ms. _____ entered the office on 6/20/2018. _____ signed consent for evaluation and possible treatment of injuries sustained as the result of a motor vehicle crash that occurred on or about 6/11/2018; _____ thought the symptoms would resolve without treatment; however, the symptoms continued. Therefore, she sought treatment since the symptoms did not subside. Patient complained at the time of the accident, she felt pain in the following area(s): left forearm, left thigh, left ankle, left foot, upper back, low back, right ankle, and right foot. Patient also complained of headaches, muscle spasms, soreness, numbness/tingling and anxiety. _____ reported that these complaints are aggravated by almost any thoracic, lumbar, and bilateral feet movements and relieved by nothing. _____ also denied previous episodes of this condition. Since that date the symptoms have been worse. _____ symptoms were not present prior to the accident; therefore it is my opinion the symptoms were caused by the accident.

**v.     Family History**

74.     The treating chiropractors who authored the initial exam reports reported positive history of a "family history" on a total of **4 patients out of the sample of 497**. The remaining patient's family history for diabetes, cancer or hypertension were recorded as denied. The example below shows "**Family History: Denies history of diabetes, cancer, hypertension." <u>This means that 99% of the patients that were seen at the 1st Choice facility "denied" any family history of three very prevalent diseases/conditions found in the normal US population</u>** (See, Ex. K).

**Claim 3009770242**

Past, Family and Social History:
   Surgery:  none reported.
   Medications:  none reported.
   Illnesses:  none reported.
   Accidents:  Asymptomatic at time of incident.
   Family History:  Denies history of diabetes, cancer, hypertension.
   Work Habits:  unemployed.
   Social Habits:  no change in social habits.
   Exercise Habits:  few times a week.
   Diet and Nutrition:  2 to 3 meals a day.

According to the American Cancer Society, 1 in 3 people will develop cancer in their lifetime. The American Diabetes Association report 10.5% of population has been diagnosed with diabetes and 26.8 million adults were undiagnosed. The CDC reports about 45% of US residents have hypertension. **Remarkably, the population of patients seen at the various 1ˢᵗ Choice facilities "denied" having any family history of diabetes, cancer or hypertension. The population of patients that presented to the 1st Choice facilities would appear to defy reasonable medical probabilities**.

vi.   **Exercise Habits**

75.   Within the 1ˢᵗ Choice reports, 93% of the patients noted to have exercise habits of "**few times a week**", regardless of age, weight or medical history and conditions. The obesity and previously noted hypertension that is rampant in the US population, would seem to contradict the reported population of patients exercising a "few times a week." Examples of patients who were reported to have been exercising a "few times a week" include a two-and-a-half-year-old male with a past medical history of surgery inducing meningitis (**See, Ex. L),** A seventy-five-year-old male with high blood pressure who underwent a triple bypass surgery and a stomach tumor and gallbladder removal (**See, Ex. M**) and a seventy-four-year-old mal recently diagnosed with non-small cell lung cancer and is status post radiation at M.D. Anderson  (**See, Ex. N**).

**Claim 7000246638-1-4 (See, Ex. L):**

Past, Family and Social History:
   Surgery:  surgery post meningitis infection as child.
   Medications:  none reported.
   Illnesses:  none reported.
   Accidents:  Asymptomatic at time of incident.
   Family History:  Denies history of diabetes, cancer, hypertension.
   Work Habits:  none reported.
   Activity of Daily Living/Social Habits: Changes in Activities of Daily Living (ADL) with some changes in social habits.
   Exercise Habits:  few times a week.
   Diet and Nutrition:  2 to 3 meals a day.

**Claim 3010931528 (See, Ex. M):**

Past, Family and Social History
   Surgery   triple bypass 2010 with clamp in heart, stomach tumor removal 2005, gallbladder removal 2006
   Medications   high blood pressure
   Illnesses  diabetes, heart trouble, high cholesterol, high blood pressure
   Accidents   Asymptomatic at time of incident
   Family History   Denies history of diabetes, cancer, hypertension
   Work Habits   self-employed
   Social Habits   does not smoke/drink
   Exercise Habits   few times a week
   Diet and Nutrition   2 to 3 meals a day

**Claim 7000201871-1-3 (See, Ex. N):**

Past, Family and Social History:
   Surgery:  Pacemaker, appendix.
   Medications:  none reported.
   Illnesses:  Lung Cancer, asthma, high blood pressure.
   Accidents:  MVA 5+ years ago, Asymptomatic at time of incident.
   Family History:  Denies history of diabetes, cancer, hypertension.
   Work Habits:  full time employed.
   Activity of Daily Living/Social Habits: Changes in Activities of Daily Living (ADL) with some changes in social habits.
   Exercise Habits:  few times a week.
   Diet and Nutrition:  2 to 3 meals a day.

**Chief Complaint:**
MVA

**History of Present Illness:**
The patient is a 74-year-old male who was transferred from the CCC with a complaint of whiplash and head trauma after motor vehicle accident. The patient was rare ended by another vehicle and suffered 2 bumps of the head.  He was able to drive himself to the emergency room where he got evaluated.  The patient has a history of coronary disease,, chronic A. fib on anticoagulation therapy.  He also has recently diagnosed with non-small cell lung cancer and is status post radiation at MD Anderson.  The patient states he was given a clean bill of health and is cancer free at this time.  Initial evaluation at the CCC showed that there was no acute bleed despite being on anticoagulation. Because of his high risk of bleeding being on Xarelto he was transferred for observation and a repeat CAT scan.  At this time he complains of cervical neck pain and shoulder pain.  He denies any chest pain, shortness of breath, dizziness or any other neurological symptoms.  He will be admitted for observation.

### vii.    Nutritional Habits

76.    Virtually 100% of the patients who sought care within the 1st Choice facility had reports that noted these patients would eat "2 to 3 meals a day." No matter their age, 2.5 years old, to 73 years old. Whether or not the patient weighed 409 pounds or 29 pounds, the frequency of consumed meals was consistently reported the same.

### viii.    Symptoms Prior to the Accident

77.    **100% of all patients seen at a 1st Choice Facility were reported to have been "asymptomatic" at the time of the subject accident** (**See, Ex. O**).

### Claim 7001111729-1-6

Past, Family and Social History:
    Surgery:  none reported.
    Medications:  none reported.
    Illnesses:  none reported.
    Accidents:  Asymptomatic right before time of incident.
    Family History:  Denies history of diabetes, cancer, hypertension.
    Work Habits:  full time employed.
    Activity of Daily Living/Social Habits: Changes in Activities of Daily Living (ADL) with some changes in social habits.
    Exercise Habits:  few times a week.
    Diet and Nutrition:  2 to 3 meals a day.

In **Claim 7001084140-1-5,** the 1st Choice past medical history records for this twenty-one-year-old male patient show no history of motor vehicle accidents and indicate "Asymptomatic right before time of accident" on February 26, 2020. However, when this same patient was seen at Celebrity Spine & Joint, the doctor's report noted the patient having been involved in two other motor vehicle accidents that pre-dated the February 26, 2020 accident (**See, Ex. P**). This suggests that the patient's past medical history was not reported correctly by 1st Choice.

History of Current Complaint:
Mr [redacted] entered the office on 3/2/2020 [redacted] signed consent for evaluation and possible treatment of injuries sustained as the result of a motor vehicle crash that occurred on or about 2/26/2020 and 2/27/2020 [redacted] thought the symptoms would resolve without treatment, however, the symptoms continued  Therefore, he sought treatment since the symptoms did not subside  Patient complained at the time of the accident, he felt pain in the following area(s)  neck, upper back, mid back and low back  Patient also complained of sleep disturbance, muscle spasms, soreness, fatigue and anxiety [redacted] reported that these complaints are aggravated by almost any cervical, thoracic, and lumbar movements and relieved by nothing  Marquece also denied previous episodes of this condition  Since that date the symptoms have been worse [redacted] symptoms were not present prior to the accident, therefore it is my opinion the symptoms were directly caused by the accident

History Review
[redacted] reports status of condition(s) below which may relate to complaint(s)
Musculoskeletal   Other than presenting musculoskeletal complaints (see examination) patient reports no additional musculoskeletal complaints
Neurological   Other than presenting complaints (see examination) patient reports no additional neurological complaints
Head and ENT   Reports no update or change
Cardiovascular   Reports no cardiovascular complaints
Respiratory   Reports no respiratory complaints
Gastrointestinal   Reports no gastrointestinal complaints
Genitourinary   Reports no genitourinary complaints
Endocrine   Reports no endocrine complaints
Derma /Hemo   Reports no dermatological or hemopoietic complaints

Past, Family and Social History
    Surgery  none reported
    Medications  none reported
    Illnesses  none reported
    Accidents  Asymptomatic right before time of incident
    Family History  Denies history of diabetes, cancer, hypertension
    Work Habits  none reported
    Activity of Daily Living/Social Habits  Changes in Activities of Daily Living (ADL) with some changes in social habits
    Exercise Habits  few times a week
    Diet and Nutrition  2 to 3 meals a day

**PATIENT NAME:** ███████████████████
**DATE OF BIRTH:** 3/25/1998
**DATE OF INJURY:** 2/26/2020
**REFERRING PROVIDER:** Dr Faqiha Ansari
**DATE OF VISIT:** 6/9/2020
**LOCATION** 12435 Beechnut St , Suite 105, Houston, TX, 77072

**VITAL SIGNS**
BP 114/73   Heart Rate 57 bpm   HT 5 ft 8 in   WT 163 lbs

**CURRENT CHIEF COMPLAINT** Thoracic and Lumbar pain

**HISTORY OF PRESENT ILLNESS.** Patient is a 22-year-old right-handed male presenting with mid-back and low back pain  He was in his usual state of good health until on or around 2/26/2020 when he was a restrained driver involved in a motor vehicle collision  Patient states he went to the emergency room where an exam was performed, x-rays were taken, and he was discharged to his treating physician  Appropriate conservative care has been provided by Dr Ansari, to include rest, decreased activities, light-duty, and physical therapy program (passive and active modalities)  Mr ███████ describes his low back pain as central and non-radiating  His mid-back pain has resolved  He further states that he has been in 3 MVAs  He has had pain in each area, and the pain has worsened with each accident

**PREVIOUS STUDIES.**
Includes MRIs (reported separately)

**PAST MEDICAL and SURGICAL HISTORY** Previous MVAs (2x - 01/2020 & 02/2020) / Denies

### ix.   Orthopedic Testing

78.    The same orthopedic tests were performed by the various 1st Choice providers, for each presenting complaint. For example, if the patient entered with lower back complaints, all of the 1st Choice providers performed the same two orthopedic tests: Straight Leg Raising (SLR) & Kemp's. The SLR is a nerve root tension test, while Kemp's test is a foraminal compression test. Each orthopedic testing procedure attempts to place a given anatomical part, isolating the anatomical area which may be involved with the presenting complaint. **Remarkably, in the population of patients who presented with lower back complaints, 100% of these patients had a reported positive SLR finding associated with BOTH legs (See, Ex. Q).** None of the examining providers at 1st Choice differentiated the reported findings, right vs. left, which is highly uncommon on its own.

**Claim 3009804900-1-4**

Ortho - Soto Hall Test performed.  Patient indicated pain in the center at the cervico-thoracic spine.
Ortho - Cervical Compression Test performed. Patient indicate increase peripheral pain which could indicate a disc injury in the neck.
Ortho - Shoulder Depression Test performed bilaterally. Patient report pain which suggest compression nerve root or foraminal irritation.

Ortho - Thoracic percussion with instrument was performed.  Patient complained of pain along the **thoracic**.

Ortho - Straight Leg Raise Test performed on left and right leg.  Patient indicated radiating pain which could indicate a disc injury in the low back.
Ortho - Kemp's Test was performed on left and right side. Patient indicated radiating pain in the leg, which could indicate a disc injury in the low back.

79.     Lumbar sprain/strain injuries will not result in positive SLR findings. **This means that 100% of the patients who entered the 1ˢᵗ Choice facilities with any and all lower back complaints, never had findings associated with simple sprain/strain injuries.** A reported positive SLR finding would be a finding associated with nerve root injuries (including disc injuries). The same is true in regard to the reported Kemp's test. **100% of the patients who had lower back complaints allegedly had positive Kemp's tests, bilaterally, which "*could* indicate a disc injury."**

80.     100% of the patient population who entered the 1ˢᵗ Choice facilities with shoulder complaints, were found to have the same 4 positive orthopedic tests. This included the reported positive Apprehension test. A truly positive Apprehension test is associated with anterior instability of the shoulder. Such instability is rare, but not in the 1ˢᵗ Choice facilities. If the test findings are to be relied upon, this would suggest that 100% of the population of patients who reported any shoulder complaints had some type instability, or dislocation. Yet, **no** surgical procedures to stabilize such a shoulder were found in a review the records.

     **x.     Neurological Findings**

81.     The various 1ˢᵗ Choice providers **never** reported any abnormalities in regard to dermatome testing, gross touch, light touch and almost always found the same normal findings in regard to deep tendon reflex in both upper and lower extremities, as well as motor testing. These normal findings are in direct conflict with the reported orthopedic test findings. True nerve root injuries, as alleged by the reported SLR and Kemp's test, would be accompanied by motor, sensory

and/or reflex deficits. As reported the 1st Choice findings represent a clinical conundrum. In addition, the 1st Choice examining providers **always** found normal cranial nerve tests, I – XII.

82.     The unusual orthopedic testing results coupled with consistently negative neurological findings advocate that these records are authored in a templated faction to lay the predicate for their universal advanced imaging recommendations and further pain management treatment.

   **xi.     Treatment Recommendations**

83.     **Almost without exception, the various treating providers at 1st Choice made the same treatment recommendations. 99% of the treatment recommendations, although made by chiropractors, did *not* include recommendations for Chiropractic Manipulative Therapy (CMT), a commonly prescribed treatment for back, neck and shoulder pain.**

84.     69% of the patients were recommended to see Scott Hung, M.D. with ProHealth, no matter the presenting conditions, or in relationship to the time that had passed from the time of the auto accident. The overwhelming majority of patients were referred for advanced imaging (MRIs, CTs) by the treating chiropractor when seen at the time of their respective first re-examinations. This was coupled by the ubiquitous recommendation for MRI's made by Dr. Hung.

85.     A referral was made to Dr. Hung by 1st Choice providers on 69% of patients seen. Dr. Hung appears to have performed a limited/cursory examination, which does not correlate with the "comprehensive" examination which was billed for using the 99204 CPT descriptor. It would appear the actual examination that Dr. Hung performed was limited to almost exclusively palpation and two orthopedic tests and almost without exception made recommendations for continued chiropractic care and "Recommend MRI C/L-spine if pain persists after 3-4 weeks of physical therapy", which usually coincided with the time of the first re-examination of the patient within

1st Choice. There were many examples found in the sample records which listed the only positive findings in red, with the most commonly prescribed treatment in black:

**Claim 3010000372-1-2 (See, Ex. R):**

**Vital Signs**
HR 76 /min, BP 121/69 mm Hg, Wt 152 lbs, BMI 26.92 Index, Ht 5 ft 3 in, Ht-cm 160.02 cm, Wt-kg 68.95 kg.

**Examination**
General Examination:
    GENERAL APPEARANCE: No acute distress.
    HEAD: Normocephalic, atraumatic.
    EYES: Anicteric, EOMI.
    EARS: External appearance normal.
    NOSE: External appearance normal.
    NECK/THYROID:  External appearance normal.
    HEART: Regular rate and rhythm.
    LUNGS: Clear.
    CHEST: Normal.
    ABDOMEN: Benign.
    EXTREMITIES: No cyanosis or edema.
    NEUROLOGIC: Nonfocal, no tremor.
      Positive cervical compression test. Positive SLR test.
Cervical Spine/Neck:
    INSPECTION/PALPATION: Tender/tense paraspinal muscles.
Thoracic Spine/Upper Back:
    UPPER BACK EXAM: Tender/tense middle trapezius & paraspinal muscles.
    MID BACK EXAM Tender/tense paraspinal muscles.
Lumbar Spine/Lower back:
    INSPECTION/PALPATION: Tender/tense paraspinal muscles.

**Claim 3011861566-1-5 (See, Ex. S):**

**Vital Signs**
HR 55 /min, BP 148/80 mm Hg, Wt 176 lbs, BMI 30.21 Index, Ht 5 ft 4 in, Ht-cm 162.56 cm, Wt-kg 79.83 kg.

**Examination**
General Examination:
    GENERAL APPEARANCE: No acute distress.
    HEAD: Normocephalic, atraumatic.
    EYES: Anicteric, EOMI.
    EARS: External appearance normal.
    NOSE: External appearance normal.
    NECK/THYROID:  External appearance normal.
    HEART: Regular rate and rhythm.
    LUNGS: Clear.
    CHEST: Normal.
    ABDOMEN: Benign.
    EXTREMITIES: No cyanosis or edema.
    NEUROLOGIC: Nonfocal, no tremor.
      Positive cervical compression test. Positive SLR test.
Cervical Spine/Neck:
    INSPECTION/PALPATION: Tender/tense paraspinal muscles.
Thoracic Spine/Upper Back:
    UPPER BACK EXAM: Tender/tense middle trapezius & paraspinal muscles.
    MID BACK EXAM Tender/tense paraspinal muscles.
Lumbar Spine/Lower back:
    INSPECTION/PALPATION: Tender/tense paraspinal muscles.

86.     Dr. Hung almost without exception wrote prescriptions, typically 3, at the time of the first evaluation. When these prescriptions were filled, they were most often filled at 1st Choice owned or affiliate companies, Sterling Pharmacy, Signature Rx and LA Rx Pharmacy with exceptionally high charges. The average pharmacy bill came to $709.00.

87.     58% of all patients were also referred for pain management consultation.  66% of those were seen at one of Celebrity Spine & Joint's seven locations by Drs. David Singleton, M.D., Lan Nguyen, M.C., Samuel Maxwell Adu-Larty, D.O., Noah Godwin, M.D., Reid Singleton, M.D. and See Chin, M.D.

88.     Most of the fees and services billed by the various treating providers at 1st Choice involved passive therapy modalities and more specifically different forms of exercises. The vast majority of the treatment dates of service consisted solely of patients performing exercises. This came in the form of using a stationary bike, walking on a treadmill, using weights. Remarkably, most patient visits included "massage." While 1st Choice billed the "massage" services using the CPT descriptor 97124 (which is for a **hands-on massage**), the report indicates this service was an "**electric hand-held massager**" which represents billing for a different service than was performed.

### Claim 3010119641-1-4 (See, Ex. T)

**Cold Pack**: Dry cold pack applied to area of complaint to decrease pain during relief phase treatment for 8 to 15 minutes (1 Unit).
**Hot Pack**: Hot moist pack applied to area of complaint to increase local circulation during relief phase treatment for 8 to 15 minutes (1 Unit).
**EMS Unattended**: Interferential EMS applied to area of complaint to decrease spasm during relief phase treatment for 8 to 15 minutes (1 Unit).
**Intersegmental Mechanical Traction**: IMT applied to full spine to increase joint mobility during relief phase treatment for 8 to 15 minutes (1 Unit).
**Therapeutic Massage**: Electrical hand-held massager performed on the area of complaint for 8 to 15 minutes to increase local circulation, to decrease hypertonicity, and to decrease spasm during relief phase treatment (1 Unit).
**Ultrasound**: Ultrasound with contact medium applied to area of complaint to decrease pain during relief phase treatment for 8 to 15 minutes (1 Unit).

### xii.     Medical Imaging

89.     In general, if the patient had gone to an emergency facility and x-rays were exposed, new x-rays were not ordered by 1st Choice providers. However, if the patient had not undergone any x-rays prior to seeking care within a 1st Choice facility, referrals were made by 1st Choice

providers. Most often there were two radiologists who provided the interpretation of the x-rays: Matthew Dang, M.D. and Chad Porter, M.D. When these two radiologists provided their interpretations, their respective reports also *made additional recommendations to obtain MRI's for more clinical clarity.* Other radiologists did not make these types of recommendations.

90.     **88% of patients underwent at least one MRI study**, with most patients undergoing two or more MRIs. **This is well above a typical chiropractic office, which often refers 10%-15% of their patients for MRIs**. The majority of MRI procedures were conducted at Memorial MRI & Diagnostic, LLC and One Step Diagnostic. **63% of the patients that underwent MRI evaluations had interpretations performed by either Drs. Matthew Dang, M.D. and/or Chad Porter, M.D.**

**B.     Farmers' Injuries Are Directly Related to and are a Proximate Cause of The Defendants' Fraudulent Scheme**

91.     The Defendants are obligated legally and ethically to act honestly and with integrity. Yet 1st Choice and the other Defendants have submitted, and caused to be submitted, to Farmers bills and documentation that are fraudulent in that they grossly templated and do not reflect accurate information pertaining to the actual patients.

92.     The object of the Defendants' scheme is to enrich Defendants by causing Farmers to rely on their fraudulent documentation and bills, thereby incurring damages by agreeing to pay PIP Claims and to settle BI and UM Claims that otherwise might not have been settled, or by paying more for PIP Claims and  to settle BI and UM Claims than they would have had they known that the Defendants' bills and supporting documentation were fraudulent. Farmers was the target of the Defendants' scheme, and the damages incurred by Farmers were the direct result and natural consequence of the Defendants' scheme.

93.     Farmers has been damaged more than $14 million in paying the PIP Claims and settling the BI and UM Claims at issue. The Defendants' fraudulent documentation and bills were

a substantial factor and, in fact, have caused Farmers to incur damages by agreeing to settle claims that otherwise might not have been settled, or by paying more to settle these claims than they would have had they known the bills and supporting documentation were fraudulent.  As a result, Farmers is entitled to more than $14 million in damages, or to a lesser amount to be proven at trial, but no less than the amounts that Defendants actually received as a result of the scheme.

## V.     CAUSES OF ACTION

### A.     FIRST CLAIM FOR RELIEF VIOLATION OF 18 U.S.C. §1962(c)

94.     Farmers incorporates, adopts, and re-alleges as though fully set forth herein, each allegation in Paragraphs 1 through 92 above.

95.     1st Choice Accident & Injury is a Texas professional association and a participant in an "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

96.     Defendants Phuc Vinh "Charlie" Huynh, D.C., Phuc Kien "Andy" Huynh, D.C., Phuc "Nancy" Hong Huynh, D.C., Danielle Bui Huynh, Susan Hanh Huynh, Houston Pain Relief & Wellness Clinic, LLC, Smart Choice Chiropractic, LLC, Defendant Maxwell Adu-Lartey, M.D.,  Texas Regional Clinic, Medical Center Chiropractic, LLC, Celebrity Spine & Joint, LLC, Scott M. Hung, M.D., ProHealth Medical Group Management, LLC, David Singleton, M.D., Reid Singleton, M.D., See Chin, M.D., Complete Pain Solutions, LLC, Matthew Dang, M.D., Chad Porter, M.D., Ali Mazloom, M.D., Origin Spine Institute, LLC, Origin MRI and Diagnostics, LLC, Origin Consulting, LLC, and Millennium Pain & Surgical Institute, LLC,  are and have been employed by and/or associated with 1st Choice or its affiliate companies. Since  at least 2016, and continuing uninterrupted to the present, the Defendants have knowingly conducted and/or participated, directly or indirectly, in the conduct of the 1st Choice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail

fraud statute, 18 U.S.C. § 1341, based upon the above-described scheme to defraud Farmers by submitting and causing to be submitted fraudulent bills with substantial templating and supporting documentation for continuing pain management that was not legitimately performed, or was not medically necessary, which in turn caused settlement checks to be deposited in the U.S. mails by Plaintiffs.

97.     Specifically, the bills and supporting documentation the Defendants submit, and cause to be submitted, to Farmers are fraudulent because patterns in the findings within the patients' initial examination reports, are not credible and evidence a medical build-up scheme with significant templating. These patterns evidence overwhelming overlap in patient information pertaining to family history, exercise habits, diet and nutrition, gait, symptoms prior to the accident, orthopedic testing results, neurological findings, treatment recommendations regardless of age, gender, or injury. Patterns are further identified in identical grammatically incorrect sentencing and missing punctuation, repeated in reports authored by the multiple providers.

98.     Each of the Defendants participate in this scheme understanding the fraudulent nature of their joint activities, and with the specific intent to defraud Plaintiffs with their fraudulent records knowing that Plaintiffs will not have an opportunity to adequately investigate those records due to the time-limited nature of the claims.

99.     The bills and corresponding mailings, which comprise the pattern of racketeering activity identified through the date of this Complaint, are described in part in representative samples of these bills and supporting documentation attached as Exs. U1 – U10.

100.     Farmers has been injured in its business and property by reason of the above-described conduct in excess of $14 million. The fraudulent documentation and bills the Defendants submit, and cause to be submitted, through 1st Choice are at the very least a substantial factor in inducing Farmers to pay more for PIP Claims and to settle BI and UM Claims that they

otherwise might not have settled, and pay more to pay PIP Claims and to settle BI and UM Claims than they would have paid had they known that the bills and supporting documentation were fraudulent. Farmers was the intended target of the scheme, and their damages are directly related to and a natural consequence of the scheme. As a result, Farmers is entitled to damages in excess of $14 million, or to a lesser amount to be proven at trial, but no less than the amounts that Defendants actually received as a result of the scheme.

WHEREFORE, Farmers demands judgment against the Defendants for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief the Court deems just and proper.

### B.   SECOND CLAIM FOR RELIEF MONEY HAD AND RECEIVED

101.   Farmers incorporates, adopts, and re-alleges as though fully set forth herein, each allegation in Paragraphs 1 through 99 above.

102.   Each of the Defendants participate in this scheme understanding the fraudulent nature of their joint activities, and with the specific intent to defraud Plaintiffs with their fraudulent records knowing that Plaintiffs will not have an opportunity to adequately investigate those records due to the time-limited nature of the claims

103.   Farmers conferred a benefit upon Defendants by paying more than $14 million for the PIP Claims and to settle the BI and UM Claims at issue, and 1st Choice and the Defendants' fraudulent bills and supporting documentation were at the very least a substantial factor in inducing Farmers to pay PIP Claims and to settle BI and UM Claims that they otherwise might not have settled, and by paying more for PIP Claims and to settle BI and UM Claims than they would have had they known that the bills and documentation were fraudulent.

104.   The money that Defendants obtained in connection with the PIP, BI, and UM Claims at issue in equity and good conscience belongs to and should be returned to Farmers.

105.     Defendants are in a unique position to know the amount of money they received from the more than $14 million that Farmers has paid to settle the PIP, BI, and UM Claims at issue. Farmers is not currently aware of the precise amount of money Defendants received. However, based upon the substantial amount of 1st Choice's charges in the PIP, BI, and UM Claims at issue – more than $14 million – Farmers alleges, on information and belief, that the amounts received by Defendants are substantial.

106.     Because the Defendants' bills were substantially templated and reflected services not performed, or not medically necessary, they had no value. Therefore, in equity and good conscience, Defendants should be required to pay restitution to Farmers in an amount equal to the total amounts they received as a result of the more than $14 million that Farmers has collectively paid to settle the PIP, BI, and UM Claims at issue.

107.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their conduct from Farmers, their injuries were inherently undiscoverable. Despite Farmers' diligence in uncovering the injurious conduct, Farmers did not discover and should not have reasonably discovered that its damages were attributable to the Defendants' conduct until May 2017, at the earliest.

WHEREFORE, Farmers demands judgment against Defendants for the above-described damages plus interest and costs and for such other relief as the Court deems equitable, just, and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Farmers demands a trial by jury.

Dated this 24th day of June, 2022.

Respectfully submitted,

**DOYEN SEBESTA & POELMA, LLLP**

By: _/s/ Scot G. Doyen_
Scot G. Doyen
Texas Bar No.  00782982
4 CityNorth
16495 Northchase Dr., Ste 1400
Houston, Texas 77060
E-mail: sdoyen@ds-lawyers.com
Tel.:  713-580-8900
Fax:  713-580-8910

OF COUNSEL

FOR PLAINTIFFS, FARMERS TEXAS
COUNTY MUTUAL INSURANCE
COMPANY, 21st CENTURY
CENTENNIAL INSURANCE CO.,
FARMERS INSURANCE COMPANY,
INC, FIRE INSURANCE EXCHANGE,
TEXAS FARMERS INSURANCE
COMPANY, FOREMOST COUNTY
MUTUAL INSURANCE COMPANY,
FOREMOST INSURANCE COMPANY
GRAND RAPIDS, MICHIGAN, HOME
STATE COUNTY MUTUAL
INSURANCE COMPANY, TRUCK
INSURANCE EXCHANGE, MID-
CENTURY INSURANCE COMPANY,
BRISTOL WEST INSURANCE
COMPANY, FOREMOST SIGNATURE
INSURANCE COMPANY, FARMERS
INSURANCE EXCHANGE.