## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

FARMERS TEXAS COUNTY MUTUAL INSURANCE COMPANY, 21st CENTURY CENTENNIAL INSURANCE CO., FARMERS INSURANCE COMPANY, INC., FIRE INSURANCE EXCHANGE, TEXAS FARMERS INSURANCE COMPANY, FOREMOST COUNTY MUTUAL INSURANCE COMPANY, FOREMOST INSURANCE COMPANY GRAND RAPIDS, MICHIGAN, HOME STATE COUNTY MUTUAL INSURANCE COMPANY, TRUCK INSURANCE EXCHANGE, and MID-CENTURY INSURANCE COMPANY, BRISTOL WEST INSURANCE COMPANY, FOREMOST SIGNATURE INSURANCE COMPANY, FARMERS INSURANCE EXCHANGE,

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Case No. 4:22-cv-02061

    Plaintiffs,

v.

1ST CHOICE ACCIDENT & INJURY, LLC, PHUC VINH "CHARLEY" HUYNH, D.C., PHUC KIEN "ANDY" HUYNH, D.C., PHUC "NANCY" HONG HUYNH, D.C., DANIELLE BUI HUYNH, SUSAN HANH HUYNH, HOUSTON PAIN RELIEF & WELLNESS CLINIC, LLC, SMART CHOICE CHIROPRACTIC, LLC, MAXWELL ADU-LARTEY, M.D., TEXAS REGIONAL CLINIC, LLC, MEDICAL CENTER CHIROPRACTIC, LLC, CELEBRITY SPINE & JOINT, LLC, SCOTT M. HUNG, M.D., PROHEALTH MEDICAL GROUP MANAGEMENT, LLC, DAVID SINGLETON, M.D., REID SINGLETON, M.D., SEE CHIN, M.D., COMPLETE PAIN SOLUTIONS, LLC, MATTHEW DANG, M.D., CHAD PORTER, M.D., ALI MAZLOOM, M.D., ORIGIN SPINE INSTITUTE, LLC, ORIGIN MRI and DIAGNOSTICS, LLC and MILLENNIUM PAIN & SURGICAL INSTITUTE, LLC,

    Defendants.

# TABLE OF CONTENTS

**EXECUTIVE SUMMARY**         **3**

**ISSUES BEFORE THE COURT**         **4**

**FACTS**         **7**

**ARGUMENT**         **11**

    **A.**     **Rico Causation is Properly and Sufficiently Plead**     **11**

    **B.**     **RICO Enterprise is Properly and Sufficiently Plead**     **13**

    **C.**     **Defendants' Roles as Culpable Persons Properly Plead**     **15**

    **D.**     **Racketeering Activity Sufficiently Plead**     **16**

    **E.**     **Money Had and Received**     **18**

    **F.**     **Limitations does not Bar Plaintiffs' Claims**     **18**

    **G.**     **Sufficient Acts Plead Related to Defendants Chin, David Singleton, Reid Singleton and Adu-Lartey**     **19**

    **H.**     **The Court has Subject Matter Jurisdiction**     **20**

    **I.**     **There is no Implication of Witness Immunity for Non-Testimonial Acts**     **20**

**CONCLUSION**         **22**

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS

COME NOW, Farmers Texas County Mutual Insurance Company, 21st Century Centennial Insurance Co., 21st Century North America Insurance Co., Bristol West Specialty Insurance, Farmers Insurance Company, Inc., Fire Insurance Exchange, Texas Farmers Insurance Company, Foremost County Mutual Insurance Company, Foremost Insurance Company Grand Rapids, Michigan, Home State County Mutual Insurance Company, Truck Insurance Exchange, and Mid-Century Insurance Company ("Farmers") to present this, their Response to Defendants' Motions[1] to Dismiss First Amended Complaint and, for cause, allege as follows:

## I.  EXECUTIVE SUMMARY

1.      Plaintiffs have sued Defendants for damages caused by a long-standing, on-going scheme in which they all actively participate -- <u>a scheme in which chiropractors purportedly treat patients, and yet NINETY NINE PERCENT (99%) of all the treatment recommendations made by the treating chiropractors DID NOT include ANY Chiropractic Manipulative Therapy, and in which </u>Defendants have knowingly submitted, or caused to be submitted, to Farmers depicting <u>fraudulent evaluation reports and billing</u>, including <u>substantial templating</u>, <u>up-coding</u>, <u>overbilling</u>, <u>billing for services not rendered</u>,  and <u>unwarranted diagnostic procedures</u>, among other *irregularities*.  Despite Defendants' assertions, Plaintiffs' Amended Complaint describes the scheme with detailed factual allegations and exhibits.  Plaintiffs have alleged multiple predicate acts of mail fraud and

---

[1] The Defendants are divided into several groups by representation and have, collectively, filed five Motions to Dismiss.  Each of the Motions tracks essentially the same arguments.  Plaintiffs' are responding to all five Motions collectively.

the existence of a valid enterprise, among the other requirements of a civil RICO claim. Defendants choose to misread, mischaracterize, or out-right ignore, those allegations. More significantly, Defendants, while citing inapplicable and unpersuasive case law from various jurisdictions, chose to omit from their Motion ANY reference to the lawsuit that had an almost *identical* Complaint, alleging almost *identical* facts, faced an almost *identical* Motion to Dismiss (brought by the same lawyers), and had that Motion DENIED – in the *same courthouse* as this Honorable Court: *State Farm Mut. Auto. Ins. Co. v. Punjwani*, 2019 U.S. Dist. LEXIS 223054; 2019 WL 7372215 (S.D. Tex. Dec. 31, 2019). Defendants also failed to acknowledge another case that involved an almost *identical* Complaint (brought by the same Plaintiffs), alleged almost *identical* facts, faced an almost *identical* Motion to Dismiss, and had that Motion DENIED – by this Honorable Court: *Farmers Texas County Mutual Ins. Company, et al v. Health & Medical Practice Associates, et al*, Cause No. 4:20-cv-04152. Plaintiffs have sufficiently alleged their civil RICO claim, as well as that the Defendants hold money that, in equity and good conscience, belongs to them. Plaintiffs' Motion to Dismiss should be denied in its entirety.

## II.  ISSUES BEFORE THE COURT

2.     Defendants contend that both causes of action in the Complaint should be dismissed for failure to state a claim under Rule 12(b)(6). In evaluating the Motions, the Court must accept as true all well-pleaded facts in the Complaint and view the allegations as a whole, in the light most favorable to the non-movant. *See Scanlan v. Texas A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). The Fifth Circuit has "consistently disfavored dismissal under Rule 12(b)(6)." *Id*. A Complaint should only be dismissed if it fails to include

allegations "that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 642 (S.D. Tex. 2016).

3.      In their Motions, Defendants collectively raise five (5) issues with respect to the Amended Complaint.   First, Defendants assert that the Amended Complaint fails to adequately allege RICO causation.   In the present case, rather than being an indirect or incidental party to the fraud, Plaintiffs were the object of it.   *See Allstate Ins. Co. v. Plambeck*, 802 F.3d 665 (5th Cir. 2015) (concluding proximate cause was satisfied in a similar case because "[t]he objective of the enterprise was to collect from insurance companies; . . . Allstate's paying up was not just incidental but was the object of the collaboration.").   Causation is properly and sufficiently plead – the whole point of the Scheme, as alleged, was the fraudulent templating of medical records to drive up the value of insurance claims.

4.      Second, Defendants argue that Plaintiffs have failed to satisfy the "enterprise" elements of their RICO claim.   RICO defines an enterprise as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity."   18 U.S.C.§ 1961(4).   Stated differently, "a RICO enterprise can be either a legal entity or an association-in-fact." *Benhamou*, 190 F. Supp. 3d at 648.   RICO does not require that an enterprise be a separate business-like entity. *Boyle v. United States*, 556 U.S. 938, 945, 129 S. Ct. 2237, 173 L. Ed. 2d 1265 (2009).   In fact, the enterprise can be proved with "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id. at*

944-45. The linchpin of enterprise status is the continuity or ongoing nature of the association. *Calcasieu Marine Nat'l Bank v. Grant*, 943 F.2d 1453, 1462 (5th Cir. 1991). "The enterprise must have continuity of its structure and personnel, which links the defendants, and a common or shared purpose." *Id.* A legal enterprise and an association-in-fact enterprise are both properly and sufficiently plead.

5.    Third, Defendants argue that Plaintiffs have failed to plead allegations establishing the Defendants as "culpable persons" potentially liable in their RICO claim. With regard to Defendants, "An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Reves v. Ernst & Young*, 507 U.S. 170, 184, [*675] 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993). Paragraphs 2, 3, and 60-90 of the Amended Complaint detail the activities of the various participants in the Scheme and provide overwhelming examples of their fraudulent, templated, medical records. The participation of the Defendants is properly and sufficiently plead.

6.    Fourth, Defendants argue that Plaintiffs have not adequately plead fraud. Defendants' assertion that Plaintiffs proof of fraud is "based solely on the conclusory idea that defendants were using templates" is gross understatement when ones considers the detailed review of 497 separate patients' records contained in the Amended Complaint. Plaintiffs do not merely say, "they use templates so it is fraudulent." Quite the contrary, Plaintiffs have detailed a review of a statistically significant sample of Defendants' medical records which demonstrates, as alleged, a "medical conundrum" in which the "unusual orthopedic testing results coupled with consistently negative neurological findings

advocate that these records are authored in a templated fa[shion] to lay the predicate for their universal advanced imaging recommendations and further pain management treatment." The fraudulent nature of the Scheme is properly and sufficiently plead.

7.     Fifth, Defendants argue that Plaintiffs have failed to state a claim for money had and received under Texas law against certain of the Defendants. However, to assert a money-had-and-received claim, a Plaintiff need only allege that the Defendant holds money, which in equity and good conscience belongs to the Plaintiff. *Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 840 (5th Cir. 2004). The Scheme in which Defendants participated is described in lengthy detail. Plaintiffs allege that the individual and corporate Defendants received money from the Scheme. Naturally, it is impossible for Plaintiffs to know which Defendants received which money from the Scheme because that information is currently only known by the Defendants themselves. Nevertheless, Plaintiffs' money had and received claim is properly and sufficiently plead.

### III. FACTS

8.     The Amended Complaint describes a scheme by which 1st Choice Accident & Injury, and the other Defendants have knowingly submitted, or caused to be submitted, to Farmers depicting <u>fraudulent evaluation reports and billing</u>, including <u>substantial templating</u>, <u>up-coding</u>, <u>overbilling</u>, <u>billing for services not rendered</u>, and <u>unwarranted diagnostic procedures</u>, which pertain to individuals ("patients") who were involved in motor vehicle accidents and asserted claims for damages against Farmers or individuals who were eligible for insurance benefits under Farmers insurance policies. (Dkt. No. 53 at ¶ 1).

9.     The fraudulent scheme is designed to enrich Defendants by exploiting two common claims scenarios, namely (a) bodily injury claims ("BI Claims") made by individuals not substantially at fault for automobile accidents to the insurance companies of the individuals who are substantially at fault for such accidents ("At-Fault Drivers"), in which they seek to recover economic losses (including past and future medical expenses) and non-economic losses (including pain and suffering); and (b) underinsured/uninsured motorist claims ("UM Claims") made by individuals to their own insurance companies if their recoveries under BI Claims from the At-Fault Drivers' insurance companies are insufficient to compensate the individuals for their economic and non-economic losses as a result of the accident. (Dkt. No. 53 at ¶ 9).

10.    The Defendants' scheme is designed to enrich Defendants by inducing Farmers to (1) rely on their bills and supporting documentation that on their face purport to substantiate the need for medical treatment and (2) settle BI and UM Claims within policy limits, and often for all or most of the limits, to protect Farmers and their insureds from potential judgments exceeding policy limits and/or avoid potential liability for bad-faith claims.  (Dkt. No. 53 at ¶ 13).

11.    To facilitate their scheme, 1st Choice and the other Defendants: (a) prepare fraudulent examination reports; (b) prepare fraudulent billing and medical reports documenting treatments that are not actually performed; and (c) provide these fraudulent documents and bills to the PI Attorneys representing the patients in BI Claims, PIP Claims, and UM Claims who, in turn, submit the bills and documentation to Farmers to support written demands to settle the claims within 30 days, and often within 14 days. (Dkt. No.

53 at ¶ 14).

12.     The Defendants' fraudulent bills and supporting documentation are designed to be and, in fact, have been substantial factors in inducing Farmers to pay the PIP Claims and to settle the BI Claims and UM Claims at issue by causing them to make higher settlement offers than would be warranted without the fraudulent bills and supporting documentation from the Defendants.

(Dkt. No. 53 at ¶ 15).

13.     The Scheme is perpetrated through a series of medical buildup steps that begin with a patient being examined by a licensed chiropractor with 1st Choice or one of its contracted providers. The initial evaluations purport to take the following, but not limited to, patients' symptoms, treatment immediately following the accident, activities of daily living, physical examination and recommendations. There are numerous instances of fraudulent reports that stem from the fraudulent business practices of the Defendants. Upon review of a statistically significant sample of 1st Choice claimants, 497 claimants, Farmers identified unusual patterns and similarities among the patients, regardless of age, gender, weight, past medical history, or current injuries. Some examples of these fraudulent activities include the following: grammatical errors and missing punctuation, report timing, exam findings, gait, family history, exercise habits, nutritional habits, prior symptoms, orthopedic testing, neurological findings, treatment recommendations, and medical imaging. (Dkt. No. 53 at ¶ 60).

14.     The pattern of treatment DOES NOT reflect proper treatment of patients.  Rather, the pattern evinces Defendant' greater forethought to profiting from unnecessary medical

procedures, and even billing for procedures that were never performed. This pattern of fraudulent billing completely undermines Defendants' ethical obligations to make the patients better, and reveals no readily discernable purpose, except to enrich Defendants at the expense of Plaintiffs. In fact, an analysis of the purported treatment for patients pushed through the Scheme reflects that NINETY NINE PERCENT (99%) of the treatment recommendations made by the chiropractors DID NOT include ANY Chiropractic Manipulative Therapy. This means that the chiropractors were more interested in furthering this Scheme than providing actual care which in greater probability, might have made their patients better. Shoehorning the medical procedures in these methods unabashedly ignored the need for a more personalized treatment plan for the patients. Therefore, by cutting all corners and pushing patients through a rather pre-engineered assembly line of treatment. (Dkt. No. 53 at ¶ 2).

15.     The Defendants are obligated legally and ethically to act honestly and with integrity. Yet the Defendants have submitted, and caused to be submitted to Farmers, bills and documentation that are fraudulent in that they are grossly templated and do not reflect accurate information pertaining to the actual patients. (Dkt. No. 53 at ¶ 91).

16.     The bills and supporting documentation the Defendants submitted, or caused to be submitted, to Farmers are fraudulent because patterns in the findings within the patients' initial examination reports are not credible and evidence a medical build-up scheme with significant templating. These patterns evidence overwhelming overlap in patient information pertaining to family history, exercise habits, diet and nutrition, gait, symptoms prior to the accident, orthopedic testing results, neurological findings, and treatment

recommendations regardless of age, gender, or injury. (Dkt. No. 53 at ¶ 8).

17.    The object of the Defendants' scheme is to enrich Defendants by causing Farmers to rely on their fraudulent documentation and bills, thereby incurring damages by agreeing to pay PIP Claims and to settle BI and UM Claims that otherwise might not have been settled, or by paying more for PIP Claims and to settle BI and UM Claims than they would have had they known that the Defendants' bills and supporting documentation were fraudulent. Farmers was the target of the Defendants' scheme, and the damages incurred by Farmers were the direct result and natural consequence of the Defendants' scheme. (Dkt. No. 53 at ¶ 92).

18.    Farmers has been damaged more than $14 million in paying the PIP Claims and settling the BI and UM Claims at issue. The Defendants' fraudulent documentation and bills were a substantial factor and, in fact, have caused Farmers to incur damages by agreeing to settle claims that otherwise might not have been settled, or by paying more to settle these claims than they would have had they known the bills and supporting documentation were fraudulent. As a result, Farmers is entitled to more than $14 million in damages, or to a lesser amount to be proven at trial, but no less than the amounts that Defendants actually received as a result of the scheme. (Dkt. No. 53 at ¶ 93).

## IV. ARGUMENT

### A.    RICO Causation is Properly and Sufficiently Plead

19.    Defendants contend that Plaintiffs have not adequately alleged RICO causation. They support this contention by asserting Plaintiffs should have included the lawyers for/with whom the Defendants work as parties in this suit. They are also critical of the fact

that some other medical provider bills are included in the settlement packets attached to the Amended Complaint.[2] They also apparently have chosen to ignore the factual allegations about the significance of the fraudulent, templated medical records on the evaluation of a *Stowers* demand – or they simply don't understand it. Lastly, they apparently have ignored the detailed allegations about the extent of the templating and fraud – including detailed examples of the TWELVE (12) categories of templated data. All of this makes sense only when one realizes that the Defendants are desperate to distinguish this case from others that are on-point and contrary in their position.

20. <u>There is no getting around the reality that the fact pattern, as alleged in the Amended Complaint, adequately pleads causation based upon the case law in this Circuit and this District.</u> 21. In *Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 642 (S.D. Tex. 2016), the Court considered the application of *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 130 S. Ct. 983, 175 L. Ed. 2d 943 (2010) to facts almost identical to those alleged in the present case. The Court noted the Supreme Court's analysis that "the focus [in the RICO context] is on the directness of the relationship between the conduct and harm." *Hemi at 12*. The *Benhamou* Court noted that it:

> need not 'go beyond the first step.' *See Holmes, 503 U.S. at 271-72* (internal citation omitted). Unlike *Anza, Holmes*, and *Hemi*, where 'the conduct directly causing the harm was distinct from the conduct giving rise to the fraud,' *Hemi, 559 U.S. at 11*, the alleged harm and alleged RICO violation in this case are directly connected … Allstate's alleged harm is the overpayment of at least 51 claims based on fraudulent bills and

---

[2] Defendants' reliance on *Farmers Ins. Exchange v. First Choice Chiropractic & Rehabilitation*, 2016 WL 10827072 (D.Or. Feb. 25, 2016) is misplaced both in the purported holding for which it is cited and for being distinguishable as a summary judgment case in which the Magistrate in Oregon was applying Oregon common law and did not grant a total dismissal of the claims.

reports, and the alleged fraud is Defendants' submissions of fraudulent bills and reports, which Allstate then paid by settlement checks sent via U.S. mail. *Id.* Thus, rather than being an indirect or incidental party to the fraud, Allstate was the object of it. *See Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 2015 WL 5472433, at *7 (5th Cir. 2015) (concluding proximate cause was satisfied in a similar case because "[t]he objective of the enterprise was to collect from insurance companies; . . . Allstate's paying up was not just incidental but was the object of the collaboration.").

22.     In the present case, putting the focus on the directness of the relationship between the conduct alleged and the harm alleged, Plaintiffs have properly and sufficiently plead causation.

### B.     RICO Enterprise is Properly and Sufficiently Plead

23.     Defendants claim that Plaintiffs have not plead the existence of an enterprise.  In reality, a plain reading of the Amended Complaint demonstrates detailed allegations of a group of health care providers all "controlled by those most closely connected to the Huyhn brothers," working with and through the legal entity First Choice, in one common enterprise to provide their respective medical services AND engage in their racketeering activity.

24.     Plaintiffs reliance upon *Allstate Ins. Co. v. Donovan*, No. 12-0432, 2012 U.S. Dist. LEXIS 92401, 2012 WL 2577546, at *13 (S.D. Tex. July 3, 2012) and *State Farm Mut. Auto. Ins. Co. v. Giventer*, 212 F. Supp. 2d 639, 650 (N.D. Tex. 2002) is misplaced. *Giventer* concerns claims against a chiropractic clinic/law office combination that did not provide services to any legitimate patients.  *Donovan* is similarly distinguishable because it alleged several independent businesses engaged in "interenterprise referrals" in an effort

to convert "otherwise 'soft-tissue' bodily injury claims into major medical claims." *Donovan at* *2. In the present case, the Amended Complaint makes it very clear that this cast of Defendants is actually an organized group of professionals sharing common ownership, treatment facilities, record-keeping, and billing. In fact, these Defendants are so closely aligned in their enterprise that they share a common custodian of records and billing record affiant – First Choice, which claims to be merely a provider of ancillary services.

25.    Despite Defendants' contrary assertions, the 5th Circuit opinion in *Plambeck* and the Southern District opinion in *Benhamou* are controlling and on-point for the present case.

26.    The *Plambeck* Court addressed these issues three years after *Donovan* and 12 years after *Giventer*, and stated:

> RICO does not require than an enterprise be a separate business-like entity. *Boyle v. United States*, 556 U.S. 938, 945, 129 S. Ct. 2237, 173 L. Ed. 2d 1265 (2009). Instead, an association-in-fact enterprise includes "a group of persons associated together for a common purpose of engaging in a course of conduct," and that enterprise can be proved with "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id*. at 944-45. A pattern of racketeering activity does not, by itself, necessarily show that an enterprise exists. *See United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981). But the evidence establishing the enterprise and the pattern of racketeering may "coalesce." *Boyle*, 556 U.S. at 947.

In establishing the standard in this Circuit, the Court noted, "The linchpin of enterprise status is the continuity or ongoing nature of the association. *Calcasieu Marine Nat'l Bank*, 943 F.2d at 1462. "The enterprise must have continuity of its structure and personnel,

which links the defendants, and a common or shared purpose." *Id*."

27.     The Defendants assertion that "at no point does the Complaint actually define what the enterprise is" is simply not accurate.  The Amended Complaint describes in great detail the "First Choice Scheme," which follows this general pattern:



and pushes patients through a pre-engineered assembly line of treatment.

28.     In this case, Plaintiffs have properly and sufficiently alleged an association-in-fact enterprise.

### C.     Defendants' Roles as Culpable Persons Properly Plead

29.     Defendants argue that Plaintiffs have failed to plead allegations establishing the Defendants as "culpable persons" potentially liable in their RICO claim.  "An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Reves v. Ernst & Young*, 507 U.S. 170, 184, [*675] 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993).   Paragraphs 2, 3, and 60-90 of the Amended Complaint detail the activities of the various participants in the Scheme and provide overwhelming examples of their fraudulent, templated medical records.  The corporate entities involved comprise parts of a dependent business structure

and are proper Defendants in this present case, supported by sufficient pleadings. *See Benhamou* at 654, 655.

30. Defendants cite only one (1) Fifth Circuit case upon which they rely for this culpable person argument. That one case, *Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 553 (5th Cir. 2012), states that the Defendants must have some part in the operation or management of the enterprise. It further states that operation and control by those not employed by the enterprise can still occur such as by bribery. Plaintiffs agree. And, in this case, each of the Defendants has participated in the Scheme by operating their respective part of the overall Scheme – as detailed in the Amended Complaint.

### D. Racketeering Activity Sufficiently Plead

31. "The term 'racketeering activity' is defined to include a host of so-called predicate acts," including mail and wire fraud. *Bridge v. Phx. Bond & Indem. Co*., 553 U.S. 639, 647, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008) (quoting U.S.C. 18 § 1961). "[W]ire fraud involves the use of, or causing the use of, wire communications in furtherance of a scheme to defraud." *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 675 (5th Cir. 2015). "<u>The mail fraud statute applies to **anyone** who knowingly **causes to be delivered by mail anything** for the purpose of executing any scheme or artifice to defraud</u>." *Id*. (quoting *United States v. Whitfield*, 590 F.3d 325, 355 (5th Cir. 2009)) (emphasis added).

32. The Amended Complaint alleges with specificity the Defendants' roles in furthering their respective portions of the medical build-up Scheme, which are then provided to plaintiff lawyers and <u>upon which claims are settled and checks mailed</u>. The Amended Complaint also describes their monetary reward for participating in the scheme.

33.    To state another way, the Amended Complaint does sufficiently allege the time, place and manner of the Defendant's participation in the Scheme, with examples of the medical records, designed to be sent through plaintiff lawyers to Farmers, that are clearly not designed to effectuate proper medical care and are not credible.

34.    Defendants' choice to ignore both the detail and cumulative effect of the allegations contained in Paragraphs 2, 3, and 60-90 of the Amended Complaint, among others, does not mean those details, and that cumulative effect does not exist. Plaintiffs' have alleged a detailed, comparative review of a statistically significant sample size of records created by the Defendants and designed to be sent through plaintiff lawyers to Farmers. Plaintiffs have identified TWELVE (12) distinct categories of data that are manufactured in the medical records regardless of age, gender, or injury of the patient. Plaintiffs concede any one, or even two or three, such categories could be purely coincidental and their allegations conclusory --- but TWELVE categories? With subparts? Standardized exam findings, standardized treatment options that do not actually involve chiropractic care that might benefit a patient, but do result in further provider referrals, overwhelming percentages of patients referred to ever-increasing consultations and radiographic studies and prescriptions, all provided by Defendants (most of which are controlled by those most closely associated with the Huynh brothers) and supported by doctors provided fraudulent findings?

35.    Contrary to Defendants' assertions, taking the facts as plead, there is more than a mere reasonable inference of fraud properly plead.

### E. Money Had and Received

36.     Defendants challenge Plaintiffs' money had and received claim against any Defendants against whom no specific allegations of fraud are made.  However, the money Plaintiffs have alleged each Defendant received relates directly to the alleged scheme to seek inflated payments for fraudulent treatments.  To assert a money-had-and-received claim, it is sufficient to allege that the Defendant holds money, which in equity and good conscience belongs to the plaintiff.  *H.E.B., LLC v Ardinger*, 369 S.W.3d 496, 507 (Tex. App. – Ft. Worth 2012, no pet.).  Importantly, the Plaintiff need not prove that the Defendant obtained the money through any wrongdoing; "rather, [the claim] looks only to the justice of the case and inquires whether the defendant has received money that rightfully belongs to another." *Id.*; *see also Mid-Town Surgical Ctr., LLP v. Blue Cross Blue Shield of Texas*, No. 11-2086, 2012 WL 3028107, at *4 (S.D. Tex. July 24, 2012).  Additionally, the Plaintiffs need not allege that the payments at issue were made directly to the Defendant.  *Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 843 (5th Cir. 2004).

37.     The Scheme in which Defendants participated is described in lengthy detail.  Plaintiffs allege that the individual and corporate Defendants received money from the Scheme.  Naturally, it is impossible for Plaintiffs to know which Defendants received which money from the Scheme because that information is currently only known by the Defendants themselves.  Plaintiffs' money had and received claim is properly and sufficiently plead.

### F. Limitations does not Bar Plaintiffs' Claims

38.     Defendants have struck upon paragraph 107 in the Amended Complaint in which

Plaintiffs' allege they did not discover and should not have reasonably discovered that its damages were attributable to the Defendants' conduct until May 2017, at the earliest. This is a scrivener's error.

39. Paragraph 107 will be withdrawn by Plaintiffs, in lieu of moving for leave to file a Second Amended Complaint.

40. This error was a scrivener's error inadvertently not corrected when paragraph 107 was inserted – it was taken from a very similar Complaint in the *Farmers v. Health and Medical* case, Cause No. 4:20-cv-04152.[3] This was an issue not addressed or raised by any Defendant prior to filing the Motion to Dismiss. Had it been recognized by Plaintiffs, it would have been corrected in the Amended Complaint.

### G. Sufficient Acts Plead Related to Defendants Chin, David Singleton, Reid Singleton, and Adu-Larty

41. Defendants Chin, David Singleton, Reid Singleton, and Adu-Larty are each active participants in the Scheme and operate and control their portions of the Scheme. Namely, the preparation of false records created utilizing the First Choice cloud-based, pre-populated, and templated reports.

42. As alleged in the Amended Complaint, Chin, David Singleton, and Reid Singleton work at or for Defendant Celebrity Spine & Joint, PC. Celebrity is one of the entities owned and controlled by the Huynh brothers.

43. As alleged in the Amended Complaint, 58% of all the patients put through the

---

[3] This is an unfortunate accident, very similar to the Defendants' statement in their Motion to Dismiss that the Court should dismiss "State Farm's RICO claims" (Page 10) when State Farm is clearly not a party in this case, but was the Plaintiff in another case in which defense counsel filed a very similar Motion to Dismiss.

Scheme end up at a pain management referral, and fully 2/3 of those end up at a Huynh controlled provider being "treated" by Chin, David or Reid Singleton, or Adu-Larty (among a few others).

44.     For their participation in the Scheme, Chin, David and Reid Singleton, and Adu-Larty received payments.  These are the facts as alleged in the Amended Complaint and they sufficiently allege acts by each of these Defendants.

### H.     The Court has Subject Matter Jurisdiction

45.     Plaintiffs acknowledge they have the burden of establishing subject matter jurisdiction, and they have done so.  The Fifth Circuit has stated that at the pleading stage, allegations of injury are liberally construed. *Little v. KPMG LLP*, 575 F.3d 533 (5th Cir. 2009). ("[O]n a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim' [of standing]." (quoting *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 889, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990)).

46.     The damages alleged herein are not speculative, nor or they dependent on the actions of others.  The Scheme as alleged is designed to cost carriers such as Plaintiffs.  The scale of the fraudulent records as shown in the statistically significant sample demonstrate the scope of the Scheme.  The injury suffered by Plaintiffs can fairly be traced to the challenged action of the Defendants.

### I.     There is no Implication of Witness Immunity for Non-Testimonial Acts

46.     Defendants have asserted a novel argument based upon a case from the Fourth Circuit that itself is both distinguishable and an expansion of immunity doctrine.  See, *Day v. Johns Hopkins Health System Corp.*, 907 F.3d 766, 771 (4th Cir. 2018).  It is certainly

well settled that witnesses enjoy absolute immunity for the things about which they <u>testify in judicial proceedings</u>.  It is a marked expansion of that doctrine to apply witness immunity to the Defendants in this case.

47.     Immunity for pre-testimony conduct, "is not limitless." *Paine v. City of Lompoc*, 265 F.3d 975, 981 (9th Cir. 2001). In addressing claims of witness immunity, court's have distinguished conspiracies to testify falsely from "non-testimonial" acts, such as "tampering with documentary or physical evidence or preventing witnesses from coming forward." *Id.* at 981—82.  The Sixth Circuit distinguished between conspiracies to testify falsely, which are immune, and manufacturing a false tape-recorded interview and providing hush money to a would-be witness, which are not.  *Spurlock v. Satterfield*, 167 F.3d 995, 1001—04 (6th Cir. 1999).  This conduct would be analogous to manufacturing the fraudulent medical records in the instant case.

48.     Indeed, the Fifth Circuit declined to extend absolute immunity to a forensic examiner's report.  *Keko v. Hingle*, 318 F.3d 639, 642—44 (5th Cir. 2003).  In *Keko*, the forensic examiner sought absolute immunity (a) for the expert report he prepared and (b) for the research and investigative work that led to the preparation of the expert report.  The Court ultimately held that the doctor's pre-testimonial activities were investigative in nature and any immunity afforded him ought to correlate with the merely qualified immunity granted to the police for comparable activities. "Thus, if, as alleged, Dr. West used shoddy and unscientific research techniques that resulted in a report critical to a baseless murder prosecution of Keko, there is no obvious reason why Dr. West should enjoy immunity greater than that of other investigators." *Id.* at 644.   This would be

analogous to the situation in the present case – the Defendants are involved in pre-testimonial, indeed, frequently pre-suit, activity. One the one hand they argue the Court does not have subject matter jurisdiction because the claimed damages depend on the lawyers and litigants, then on the other hand they claim to be such an integral part of a judicial proceeding that they are afforded absolute immunity for the fraudulent records they perpetrate.

## V. CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that the Court DENY Defendants' Motion to Dismiss in its entirety, and for such other and further relief as they may be entitled to receive.

Respectfully submitted,

By:    Scot G. Doyen
         Scot G. Doyen
         Texas Bar No. 00782982
         4 CityNorth
         16495 Northchase Dr., Ste 1400
         Houston, Texas 77060
         E-mail: sdoyen@ds-lawyers.com
         Tel.: 713-580-8900
         Fax: 713-580-8910

OF COUNSEL

Doyen Sebesta & Poelma, LLLP          ATTORNEY IN CHARGE FOR
                                              PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 2, 2023 the foregoing document was served on all

counsel of record via the Court's CM/ECF system:

*/s/ Scot G. Doyen*
Scot G. Doyen
